IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2020

## STATE OF TENNESSEE v. DANIELLE LYNETTE WRIGHT

**Appeal from the Criminal Court for Knox County**
No. 108613   Steven Wayne Sword, Judge

_____

### No. E2019-01290-CCA-R3-CD
_____

Defendant, Danielle Lynette Wright, was convicted of second-degree murder by a Knox County Jury. She received a sentence of seventeen years' incarceration. On appeal, Defendant argues that the evidence was insufficient to sustain her conviction of second-degree murder. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr. (on appeal), and Joseph A. Fonduzz (at trial), Knoxville, Tennessee, for the appellant, Danielle Lynette Wright.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Facts and Procedural History*

Defendant admits that on April 3, 2016, she shot the victim, Purnell Nimmons. The bullet hit the victim in his back, went between his ribs, hit his right lung and his heart, and ultimately lodged in his sternum. By the time police arrived at the scene, the

victim was deceased. Defendant was indicted for first-degree murder. However, after a three day jury trial she was found guilty of second-degree murder.

The testimony and proof at trial established that the victim and Defendant had been romantically involved. During her annual physical exam, Defendant discovered that she had contracted herpes. She had reason to believe that the victim had infected her with the disease. She attempted to confront the victim "at least three times," but the victim avoided the subject each time. On Valentine's Day, 2016, Defendant got off work early and went home. The victim lived with Defendant at that time, but he was not home and did not arrive home until the early morning hours of the following day. Defendant was upset with the victim and told him to leave. Defendant then burned some clothing that belonged to the victim and left.

The day of the murder, the victim was out shopping with a friend, Shannita Whaley. Afterwards, the victim contacted Defendant and asked her to pick him up so he could retrieve some shoes and clothing that he had left at her house. Defendant picked up the victim and took him to her house. She again confronted the victim about her herpes diagnosis. The victim walked away from Defendant and left the house.

Defendant got in her car and found the victim at the Lakeview Motel, which was a short distance from her house. Defendant exited the vehicle with her hand at her side and walked towards the victim, yelling at him. The victim locked himself in the lobby to get away from Defendant. Defendant yelled loudly enough that it drew the attention of Anna Patel, the motel manager, and Robert Oakley, a resident and part-time worker at the motel. Mr. Oakley came out of his room to investigate, but Defendant had already returned to her car and left the motel. Ms. Patel asked the victim to leave the motel lobby and go back outside. Mr. Oakley approached the victim and noted that the victim appeared scared or worried. The victim asked Mr. Oakley the address of the motel so he could have someone pick him up. The victim told Mr. Oakley that Defendant "done pulled a gun on me, and she threatened to shoot me." The victim called Ms. Whaley, and gave her the motel's address. Ms. Whaley testified that the victim sounded terrified and that she heard him say "she has a gun."

While the victim waited for a friend to pick him up, Defendant returned to the motel on foot. This time, Defendant had on a jacket, but her hand remained at her side, supporting a gun tucked in her waistband. Once the victim saw Defendant approaching, he attempted to re-enter the motel lobby. Defendant wedged her foot in the door, and the victim was unable to close and lock the door. The victim pushed Defendant away and attempted to close the door. Defendant pulled her gun out of her waistband, pulled the door open and fired two shots. One shot hit the wall of the lobby, and the other shot hit the victim. Realizing that she had shot the victim, Defendant walked away from the

scene, stopping to pick up one of the ejected bullet casings along the way. The entire event was caught on the motel's security cameras.

Upon returning home, Defendant called her college friend, Tiffany Smith, and drove about forty-five minutes to her house. She admitted to Ms. Smith that she shot the victim. The two had a drink and talked. Defendant showered and spent the night at Ms. Smith's house. The following morning after Defendant learned that the victim died as a result of the shooting, she "lost it" and drove to her mother's house near New Orleans, Louisiana. After several days, Defendant returned to Knoxville and turned herself in to police.

During the ensuing days after the shooting, Knoxville Police Department Officer Thomas Thurman was looking for Defendant. Officer Thurman traced Defendant to Louisiana by tracking her cell phone. He did not find Defendant in Louisiana as she had been tipped off to his presence.

Before Defendant turned herself in, a search warrant was executed for her house. A box for a Ruger LCP that fired .38 caliber bullets was found during the search. The gun matched the type of bullet found at the scene of the shooting. While the weapon was not found, the gun box contained a casing from a test-fired round that the manufacturer shipped along with the gun. Patricia Resig, an expert firearms examiner assigned to the forensic unit of the Knoxville Police Department, confirmed that the casing was fired from the same gun as the shell casing found at the scene. The casing from the box and the bullet from the box were the same brand and type of ammunition. Knoxville Police Department Officer J.D. Sisk used the serial number located on the gun box and traced the ownership of the gun, through a government database, to Defendant.

Defendant testified that it was not her intent to kill the victim. She just "wanted to frighten him, not harm him." She claimed that she was "agitated and very upset" and that she had "a whole bunch of different emotions running through her head at that time." Defendant was mad at the victim for not talking with her. Defendant knew that one round hit the victim, and she acknowledged that she walked away and did not render aid. Defendant went to Louisiana for several days "to get [her] things in order." The proof established that Defendant was formerly in the military, had a handgun carry permit, and was experienced with the handling of a gun.

Defendant filed a motion for a new trial, which the trial court denied. It is from that denial that Defendant now appeals.

*Analysis*

Defendant argues that the evidence was insufficient to convict her of second-degree murder. Specifically, Defendant argues that here was insufficient proof for a rational jury to conclude that she intended to kill the victim. Alternatively, Defendant argues that a rational jury should have concluded that she acted in a state of passion, recklessly, or in a criminally negligent manner. The State argues that the evidence was more than sufficient to support the verdict and that intent is irrelevant in a second-degree murder conviction. The State further argues that Defendant's alternative theory is without merit. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In relevant part, second-degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. 39-11-106(a)(22).

Here, the proof at trial showed that Defendant had her gun, drew it, and fired two shots. By Defendant's own admission, she knew she shot the victim. The video from the

motel's security cameras also showed Defendant shooting the victim. She walked back to the motel instead of driving so the victim would not be aware of her approach. When the victim retreated to the motel lobby, Defendant pulled her gun and fired. The trial court commented at the sentencing hearing that he was "surprised the jury didn't come back with first-degree murder . . . just looking at the video, it appeared to be a planned-out, premeditated ambush."

Defendant was formerly in the military, had a handgun carry permit, and was well versed in the handling of a gun. A rational jury could reasonably conclude that Defendant shot the victim and was aware that shooting him was reasonably certain to cause his death. Defendant is not entitled to relief.

Alternatively, Defendant claims that she should have been convicted of a lesser-included offense. She argues that she was in state of mind that led her to act irrationally. Defendant argues that the victim's refusal to talk with her made her mad and "very agitated, very upset, disappointed" and that she had a "whole bunch of different emotions running through [her] head." The jury was specifically instructed on the differences between the lesser-included offenses and second-degree murder. In returning the verdict of second-degree murder, the jury weighed the evidence and determined the credibility of the testimony. They reached a decision that Defendant acted knowingly. This was certainly within the jury's purview, and this Court will not reweigh the evidence. *Morgan*, 929 S.W.2d at 383. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE